**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CUSTOM ALUMINUM | ) | |
| PRODUCTS INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:17 C 5785 |
| v. | ) | Hon. Marvin E. Aspen |
| | ) | |
| AMERISURE INSURANCE CO. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

This dispute concerns whether an insured party's claim exceeds the applicable deductible. Defendant Amerisure Insurance Co. ("Amerisure") insured Plaintiff Custom Aluminum Products Inc. ("Custom"). In 2016, Custom experienced an equipment breakdown with one of its aluminum extruders, causing Custom to incur extra expenses as it shifted production to other facilities. Custom filed a claim for its extra expenses with Amerisure. Although the parties agree that the insurance policy covered extra expenses, Amerisure paid nothing on the claim after finding that Custom's extra expenses were within the deductible as defined by a formula in the insurance contract. Custom contends that it is owed payment either because the deductible formula sums to zero, or because Amerisure otherwise calculated the deductible improperly. The parties have filed cross-motions for summary judgment on Count I of Custom's complaint, alleging breach of contract.[1] (Custom's Mot. for Summ. J. (Dkt. No. 16); Amerisure's Cross-Mot. for Summ. J. (Dkt. No. 22).) For the reasons set forth below, we grant in part and deny in

---

[1] Count II, alleging bad faith denial, is not before us on these motions. (*See* Compl. (Dkt. No. 1–1) at PageID #:12–13.)

part Custom's motion for summary judgment and deny Amerisure's cross-motion for summary judgment.

## BACKGROUND[2]

Custom is a company based in Illinois that specializes in all steps of aluminum production, from extrusion to painting, fabrication, and assembly.  (Custom's Rule 56.1 Statement of Material Facts ("Custom SOF") (Dkt. No. 16–2) ¶¶ 1, 5.)  Custom purchased commercial property insurance from Amerisure under policy number CPP 2012919130015 ("Policy") for policy period September 1, 2015 through September 1, 2016.  (*Id.* ¶ 8; Policy at PageID #:15.)  The Policy provided coverage for extra expenses incurred after equipment breakdowns.  (Custom SOF ¶ 10; Policy at PageID #:26.)

In March 2016, one of Custom's aluminum extruders, known as Press 4, began to break down.[3]  (Custom SOF ¶ 18; Amerisure's Rule 56.1 Statement of Material Facts ("Amerisure SOF") (Dkt. No. 21) ¶ 71.)  Press 4 is located at 620 Division Street, South Elgin, Illinois, and is the only extruder in that building.[4]  (Custom SOF ¶ 38.)  To keep production on

---

[2] Unless otherwise noted, the facts described herein are undisputed and culled from the parties' Local Rule 56.1 statements of fact, (Dkt. Nos. 16–2, 21), the insurance policy at issue, (Policy (Dkt. No. 1–1) at PageID #:15–119), a declaration of Custom's Controller, John Schuman, (Schuman Decl. (Dkt. No. 16–3)), and Schuman's July 10, 2018 deposition.  (Schuman Dep. (Dkt. No. 21–1).)

[3] Schuman explained that extrusion involves heating an aluminum log, or "billet," to about 900 degrees so that it becomes pliable.  (Schuman Dep. at 11.)  The heated metal is then placed in an extrusion press, which has a die in the shape of the profile of the product they want to make.  (*Id.*)  The press then pushes the metal through the die to form a lineal extrusion.  (*Id.*)  Common products include parts for hospital carts, doors, windows, or lighting fixtures.  (*Id.*)

[4] Custom's statements of fact and Schuman's declaration both refer to an extruder location at Elgin, Illinois.  (Custom SOF ¶ 38; Schuman Decl. ¶ 10.)  However, Schuman's deposition and the exhibits therein refer only to Custom locations in *South* Elgin, Illinois.  (Schuman Dep. at 21 (noting all of Custom's extruders in 2015 were in South Elgin); Dkt. No. 21–2 at 1 (showing Custom's two locations as either South Elgin, Illinois or Genoa, Illinois).)  Moreover, all locations specified in the Policy refer exclusively to South Elgin, including the only mentions of

schedule and to avoid losing income, Custom slowed down Press 4 and shifted production to other extruders, incurring $211,534.00 in extra expenses. (*Id.* ¶¶ 19, 25; Schuman Dep. at 43–45.) All of Custom's other extruders operated without incident throughout this time period. (Custom SOF ¶ 39.)

The Policy does not have a specific dollar deductible for extra expense coverage. (*Id.* ¶ 15.) Instead, the Policy provides a formula to determine the deductible. (*Id.* ¶ 16.) The Policy specifies that Amerisure will "pay only that part of [Custom's] loss over the deductible amount stated on the 'schedule of coverages' in any one occurrence."[5] (*Id.* ¶ 13.) The Policy's "Schedule of Coverages" provides in part:

> **EQUIPMENT BREAKDOWN**
> –  Deductible – Property Damage  $ <u>SEE BELOW</u>
> –  Deductible – Business Income and Extra  <u>        </u> days
>     Expense # of days Average Daily Value (ADV)

(Policy at PageID #:26.) Below on the same page, the Policy provides the following:

> **OPTIONAL COVERAGES AND ENDORSEMENTS**
> MECHANICAL, ELECTRICAL OR PRESSURE SYSTEMS BREAKDOWN
> DEDUCTIBLE SCHEUDLE: PROPERTY DAMAGE: $10,000 – EXCEPT $50,000
> FOR EXTRUDERS, THEIR DRIVING PUMPS, MOTORS AND VESSELS.
>
> BUSINESS INCOME AND EXTRA EXPENSE: 2X ADV – EXCEPT 3X ADV FOR
> EXTRUDERS, THEIR DRIVING PUMPS, MOTORS AND VESSELS

(*Id.*; Custom SOF ¶ 16.) The parties agree that the deductible for extra expenses related to an extruder breakdown is "3X ADV." (Custom SOF ¶ 16; Amerisure SOF ¶ 16.) That is, the

---

"620 Division Street." (*E.g.*, Policy at PageID #:27, 113.) The evidence in the record thus indicates that the extruder at issue is located at 620 Division Street, South Elgin, Illinois.

[5] The Policy has another provision that appears to supersede the deductible provision as quoted by the parties, but neither party disputes that Custom is responsible for covered costs up to the applicable deductible and that Amerisure will pay any amounts exceeding the deductible. (*See* Custom SOF ¶¶ 13–16.) The superseding deductible definition reads, in part: "For the locations described on this schedule, 'we' pay only that part of 'your' loss over the deductible amount indicated for the described location, in any one occurrence." (Policy at PageID #:59.)

formula is "ADV," which stands for the "Average Daily Value (ADV)," multiplied by three.[6]

(Custom SOF ¶¶ 16, 17, 30; Amerisure SOF ¶ 16.)  The Policy's "Definitions" section defines

"Average Daily Value (ADV)" as follows:

> Average Daily Value (ADV) means the loss of income for all locations, affected by the "Equipment Breakdown," that would have been earned had no "Equipment Breakdown" occurred during the interruption of business, divided by the number of working days, in that period.
>
> The number of days indicated in the "Equipment Breakdown" section of the COMMAND® Schedule of Coverages Commercial Output Program will be multiplied by the ADV as determined above.  The result will be used as the Business Income or Extra Expense dollar deductible.
>
> The ADV applies to all locations included in the valuation of the loss.
>
> **Example:**
>
>> Business is interrupted partially or completely for 10 days.  If there had been no "Equipment Breakdown", the total location income for those 10 days would have been $5,000.
>>
>> The Income Protection Deductible is 3 X the ADV
>>
>> $5,000 divided by 10 days = $500 ADV
>>
>> 3 X $500 = $1,500 Loss of Income Protection Deductible

(Custom SOF ¶ 17; Policy at PageID #:64.)

Custom claimed $211,534.00 in extra expenses it incurred because of the broken Press 4.

(Custom SOF ¶ 25.)  Amerisure processed the claim by turning to the formula provided in the

Policy to calculate the extra expense deductible.  (*Id.* ¶ 30.)  The first step required Amerisure to

determine the ADV, which by the terms of the first sentence of the ADV definition can be

---

[6] The parties also agree that the deductible for extruder property damage has a specific dollar value of $50,000.  (Custom SOF ¶¶ 14, 16; Amerisure SOF ¶ 16.)  Custom filed a separate claim for $96,166.51 for the damage to Press 4, and in turn Amerisure paid Custom $46,166.51 (subtracting the $50,000 extruder property damage deductible).  (Custom SOF ¶¶ 22, 23.)  This part of the insurance claim is not at issue here.

expressed as the division of a numerator by a denominator. The numerator is described by all words in the first sentence before "divided by;" the denominator is "the number of working days, in that period." (*Id.* ¶¶ 17, 30, 32, 34.)

For the ADV numerator, Amerisure chose $21,590,000.00, a figure listed as Custom's total estimated "Business Income Value" for the twelve months ending December 31, 2015. (*Id.* ¶¶ 33, 36.) This figure was recorded on a 2015 worksheet that Custom filled out as part of its application to renew insurance for the following year (*i.e.*, the policy period at issue here). (*Id.* ¶ 32.) At no point did Amerisure advise Custom that it would turn to the estimated Business Income Value to calculate deductibles for a 2016 insurance claim. (*Id.* ¶ 43.)

For the ADV denominator, Amerisure figured "the number of working days, in that period" as the number of weekdays in 2016 (260 days) minus federal holidays, for a total of 251 "working days." (*Id.* ¶ 34.) Amerisure found that it was "reasonable to believe" Custom would operate this many days in 2016. (*Id.*)

Dividing the numerator ($21,590,000.00) by the denominator (251 working days), Amerisure calculated an ADV of $86,015.94. (*Id.* ¶ 30.) Amerisure rounded this ADV to the nearest dollar ($86,016.00) and multiplied it by three as specified in the Policy's extruder extra expense deductible to reach a final deductible of $258,048.00. (*Id.* ¶ 31.) Because the deductible as calculated by Amerisure exceeded Custom's $211,534.00 claim for extra expenses, Amerisure denied payment. (*Id.* ¶ 27.)

When the Press 4 breakdown occurred, Custom was current on its premium payments. (*Id.* ¶ 11.) Because Custom was able to keep up with its orders by shifting production during the extruder malfunction, Custom did not lose any income from the equipment failure, even as it incurred extra expenses to reallocate operations. (*Id.* ¶ 28.) Custom's extruders operated for a

total of 300 days in 2016; Press 4 alone operated for 262 days in 2016.  (*Id.* ¶ 42;

Amerisure SOF ¶ 75.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A

genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S. Ct. 2505, 2510 (1986).  This standard places the initial burden on the moving party to

identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, which it believes demonstrate the absence of a

genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323,

106 S. Ct. 2548, 2553 (1986) (internal quotations omitted).  Once the moving party meets this

burden of production, the nonmoving party "may not rest upon the mere allegations or denials of

the adverse party's pleading" but rather "must set forth specific facts showing that there is a

genuine issue [of material fact] for trial."  Fed. R. Civ. P. 56(e).  In deciding whether summary

judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all

reasonable inferences in that party's favor.  *See Anderson*, 477 U.S. at 255, 106 S. Ct. at 2513.

"On cross-motions for summary judgment, the Court assesses whether each movant has satisfied

the requirements of Rule 56."  *Portalatin v. Blatt, Hasenmiller, Leibsker & Moore, LLC*,

125 F. Supp. 3d 810, 813 (N.D. Ill. 2015).  As with any summary judgment motion, we consider

cross-motions for summary judgment "construing all facts, and drawing all reasonable inferences

from those facts, in favor of the non-moving party."  *Laskin v. Siegel*, 728 F.3d 731, 734

(7th Cir. 2013) (citing *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008)).

**ANALYSIS**

The parties dispute whether Custom's claim for extra expenses exceeded the applicable deductible under the Policy. Custom advances two theories by which it owes no deductible for extra expenses, thus entitling it to full reimbursement for its $211,534.00 extra expense claim. Amerisure by contrast argues that its ADV calculation was proper, and that the deductible entitles Custom to no reimbursement. Their arguments require us to interpret the Policy. Depending on that interpretation, the parties also dispute what numbers apply to the ADV calculation to generate the deductible—and thus to determine damages, if any—in this case.

## I. INTERPRETATION OF THE POLICY

The parties agree that Illinois law governs this dispute. (Custom's Mem. of Law in Supp. of Mot. for Summ. J. ("Mem.") (Dkt. No. 16–1) at 7 n.2; Amerisure's Resp. ("Resp.") (Dkt. No. 22) at 2 n.1.) "Under Illinois law, the interpretation of an insurance policy is a question of law that is properly decided by way of summary judgment." *Nationwide Ins. Co. v. Cent. Laborers' Pension Fund*, 704 F.3d 522, 525 (7th Cir. 2013) (quoting *BASF AG v. Great Am. Assur. Co.*, 522 F.3d 813, 818–19 (7th Cir. 2008)); *accord Rich v. Principal Life Ins. Co.*, 226 Ill. 2d 359, 371, 875 N.E.2d 1082, 1089 (Ill. 2007); *Crum & Forster Managers Corp. v. Resolution Tr. Corp.*, 156 Ill. 2d 384, 391, 620 N.E.2d 1073, 1077 (Ill. 1993). As the Illinois Supreme Court has stated:

> A court's primary objective in construing the language of an insurance policy is to ascertain and give effect to the intentions of the parties as expressed by the language of the policy. Like any contract, an insurance policy is to be construed as a whole, giving effect to every provision, if possible, because it must be assumed that every provision was intended to serve a purpose.

*Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 223 Ill. 2d 352, 362, 860 N.E.2d 307, 314 (Ill. 2006) (citations omitted); *see also Rich*, 226 Ill. 2d at 371, 875 N.E.2d at 1090 ("All the provisions of the insurance contract, rather than an isolated part, should be read together to

interpret it and to determine whether an ambiguity exists." (quotation omitted));

*Weiss v. Bituminous Cas. Corp.*, 59 Ill. 2d 165, 171, 319 N.E.2d 491, 495 (Ill. 1974). In doing so, the Court must consider "the type of insurance for which the parties have contracted, the risks undertaken and purchased, the subject matter that is insured and the purposes of the entire contract." *Crum & Forster*, 156 Ill. 2d at 391, 620 N.E.2d at 1078 (citing *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 154 Ill. 2d at 108, 115, 607 N.E.2d 1204, 1212 (Ill. 1992)).

"If the words used in the policy, given their plain and ordinary meaning, are unambiguous, they must be applied as written." *Valley Forge*, 223 Ill. 2d at 363, 860 N.E.2d at 314. While the Court must strictly construe an ambiguous insurance contract against the drafter, *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 223 Ill. 2d 407, 417, 860 N.E.2d 280, 286 (Ill. 2006), we "will not search for ambiguity where there is none." *Valley Forge*, 223 Ill. 2d at 363, 860 N.E.2d at 314 (citing *Crum & Forster*, 156 Ill. 2d at 391, 620 N.E.2d at 1078). "Words are ambiguous if they are reasonably susceptible to more than one interpretation, not simply if the parties can suggest creative possibilities for their meaning." *Id.* (citations omitted).

## A. "Income . . . that Would Have Been Earned"

Custom first argues that since it did not lose income from its extruder breakdown (by shifting production to fill all orders), the ADV numerator is zero, making the extra expense deductible zero as well. (Mem. at 8.) Custom's argument relies on the first sentence of the ADV definition, which defines the ADV numerator. (*Id.*) That sentence reads in relevant part, "Average Daily Value (ADV) means the loss of income for all locations, affected by the 'Equipment Breakdown,' that would have been earned had no 'Equipment Breakdown' occurred during the interruption of business . . . ." (Custom SOF ¶ 17.) Custom contends that the ADV numerator requires that Custom first suffer a "loss of income" to trigger the ADV formula at all.

(Mem. at 8.) Without a "loss of income," Custom argues that the ADV numerator is zero, negating any extra expense deductible through division and multiplication by zero. (*Id.*) Custom further argues that calculating ADV without reference to some "loss" would render that word as used in the ADV definition meaningless, contrary to principles of contract interpretation that seek to give meaning to every word and provision. (*Id.*)

Amerisure, by contrast, contends that Custom reads the first part of the ADV definition out of context. (Resp. at 4.) Amerisure argues that the proper way to calculate ADV is to reference the example provided in the ADV definition. (*Id.* at 3.) The example applies the ADV formula to a simple hypothetical: a business interrupted partially or completely for 10 days. (Custom SOF ¶ 17.) The example continues, "If there had been no 'Equipment Breakdown', the total location income for those 10 days would have been $5,000." (*Id.*) The example then divides $5,000 by 10 days to reach an ADV of $500. (*Id.*; Policy at PageID #:64.) Amerisure argues that the proper value for the ADV numerator, per the example in the definition, is the total income the affected location would have made had operations continued normally. (Resp. at 3–4.) Amerisure urges that this interpretation is consonant with the first sentence of the ADV definition that refers to income "that would have been earned" had no malfunction occurred, and that Custom likewise erases these words from the ADV provision. (*Id.* at 4; Custom SOF ¶ 17.) Citing contract interpretation principles that specific provisions control over general provisions, Amerisure argues that the example is the "specific" provision that should guide our decision over the more "general" ADV definition. (Resp. at 4–5.)

Custom's argument that the ADV numerator refers to a "loss," while appealing in isolation, makes little sense in the context of either the full sentence upon which Custom relies or the full ADV definition. *See Rich*, 226 Ill. 2d at 371, 875 N.E.2d at 1090; *Weiss*, 59 Ill. 2d at 171, 319 N.E.2d at 495. The first sentence of the ADV definition defies grammar

and logic if the word "loss" is read to form a vital part of the ADV numerator. Reduced to its operative relevant phrases, the ADV definition's first sentence reads: "Average Daily Value (ADV) means the loss of income . . . that would have been earned had no 'Equipment Breakdown' occurred." (Custom SOF ¶ 17.) We do not know how either a "loss" or a "loss of income" could be "earned" as that word is used in normal construction, nor why an insured would suffer any "loss" or "loss of income" at all "had no 'Equipment Breakdown' occurred." Custom's attempts to harmonize this discord are unconvincing. Custom argues that only if it incurs lost income does the "question to be answered" become "what 'would have been' earned had no equipment breakdown occurred." (Custom's Reply (Dkt. No. 23) at 2.) But if there is no lost income, Custom argues that there is "clearly no 'loss of income . . . that would have been earned,'" resulting in an ADV numerator of zero. (*Id.*) Custom's distinction does little to clarify the language, instead merely underscoring that the phrase "loss of income" does not sit comfortably with the phrase "would have been earned." While use of the word "loss" is confusing in the first sentence of the ADV definition, we are not bound to adopt "strained or unreasonable" interpretations that would fail to effectuate the parties' agreement when read as a whole. *JG Indus., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 218 Ill. App. 3d 1061, 1066, 578 N.E.2d 1259, 1261 (1st Dist. 1991); *see Temme v. Bemis Co.*, 622 F.3d 730, 736 (7th Cir. 2010) (reading the full contract "clarifies the ambiguity caused by reading" the ambiguous provision "on its own").

We thus turn to the example included in the full ADV definition for guidance on the meaning of the ADV numerator. Rearranged slightly, the example articulates the ADV numerator as what the "total location income" "would have been" "[i]f there had been no 'Equipment Breakdown.'" (Custom SOF ¶ 17.) The example makes no reference to an amount of "loss" to form the ADV numerator. The example's phrasing appears to match the ADV

definition's first sentence for income "that would have been earned had no 'Equipment Breakdown' occurred," (Custom SOF ¶¶ 16, 17), and thus gives meaning to the ADV definition read as a whole. *See Minnesota Life Ins. Co. v. Kagan*, 724 F.3d 843, 849 (7th Cir. 2013) ("[B]ecause words derive their meaning from the context in which they are used, *a contract must be construed as a whole*, viewing each part in light of the others." (quoting *Gallagher v. Lenart*, 226 Ill. 2d 208, 233, 874 N.E.2d 43, 58 (Ill. 2007))). Taking the definition's terms together, the "total location income" "[i]f there had been no 'Equipment Breakdown'" is the right value to use as the ADV numerator under the Policy. (*See* Custom SOF ¶ 17.)[7]

Custom argues that the ADV example should be construed as merely one hypothetical scenario that does not bear on the ADV definition as articulated in the definition's first sentence. (Custom's Reply at 5.) At the outset, we observe that the example's placement within the ADV entry in the Policy's "Definitions" section lends the example some weight as forming part of the overall ADV definition. (Policy at PageID #:64.) *See, e.g.*, *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 785 (7th Cir. 2015) (giving effect to term in insurance policy "Definitions" section). In addition, although the specific numbers employed in the example would change with

---

[7] This is not to say that the word "loss" in the first sentence is meaningless. Although we find the term "loss" extraneous to the ADV calculation, the ADV definition appears to contemplate that the insured suffered a "loss" of some sort. Custom stresses that it suffered no lost income, (Custom SOF ¶ 19), but Custom clearly spent money it would not have otherwise and now seeks reimbursement for that money through its insurance claim and this suit. (*See* Policy at PageID #:96 (defining "Extra Expenses" as costs the insured "would not have incurred if there had been no direct physical loss or damage to property").) It is not unheard of to include expenses incurred within the definition of "loss." *See, e.g.*, 18 U.S.C. § 2259(b)(3) (restitution statute defining the term "full amount of the victim's losses" as including "any costs incurred by the victim"); *Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 815 (7th Cir. 2006) (including within "future losses" both "income foregone" and "expenses incurred"). Custom's claim can be considered a "loss" of this kind. And as Custom argues, if there is a "loss," "then the question to be answered [in calculating ADV] is what 'would have been' earned had no equipment breakdown occurred." (Custom's Reply at 2.) We agree.

each claim, the ADV calculation would remain constant. The example's simplified figures and multiplier are a for-instance, but the ADV calculation would operate the same way with any set of numbers matching the appropriate definitions.

We therefore find that the ADV numerator is unambiguous when the Policy is viewed as a whole, and it requires a value representing the "total location income" that "would have been earned had no 'Equipment Breakdown' occurred" during the period of the breakdown. That is, the numerator requires income that the location affected by the breakdown would have been expected to make if all equipment had been running normally over the relevant period of days. In construing this phrase, we deny that portion of Custom's motion for summary judgment that would require a "loss" to trigger the ADV formula.

### B. "Business Income and Extra Expense"

Second, Custom asserts that the deductible at issue, described in the Policy as a "Business Income *and* Extra Expense" deductible, applies only when both of those items are claimed. (Mem. at 12.) Since Custom incurred only extra expenses, Custom argues the deductible provision does not apply to its insurance claim. (*Id.*) In addition, Custom acknowledges that another portion of the Policy, in the ADV definition, refers to a "Business Income *or* Extra Expense dollar deductible," and as such the alternating use of "and" and "or" makes the deductible provision ambiguous, requiring us to strictly construe the Policy against Amerisure. (*Id.* at 12–13.)

We "will not search for ambiguity where there is none." *Valley Forge*, 223 Ill. 2d at 363, 860 N.E.2d at 314. On its own, the word "and" may present ambiguity as either a conjunctive ("only both P and Q") or as an inclusive disjunctive ("P or else Q or else both"). E. Allan Farnsworth, *Farnsworth on Contracts* §7.8 (3d Ed., 2018–3 Cum. Supp. 2003). Similarly, the word "or" may be ambiguous as either an exclusive disjunctive ("P or else Q but not both") or as

an inclusive disjunctive ("P or else Q or else both").  *Id.*  Although "and" and "or" "ordinarily are not commutual terms" and "should not be considered interchangeable absent strong supporting reasons," *Manor Healthcare Corp. v. Soiltest, Inc.*, 192 Ill. App. 3d 934, 941, 549 N.E.2d 719, 725 (1st Dist. 1989), the Policy does precisely that, using "and" in one place and "or" in another to conjoin the same terms.  This alternating usage suggests that both conjunctions share the meaning they have in common as an inclusive disjunctive: in other words, "Business Income or else Extra Expenses or else both." *See Chi. Land Clearance Comm'n v. Jones*, 13 Ill. App. 2d 554, 559, 142 N.E.2d 800, 803 (1st Dist. 1957) ("[I]n order to effectuate the intention of the parties to a contract, where the intention is evident, the word 'and' may be construed to mean 'or.'").  As such, a claim only for extra expenses and not for business income will still trigger the deductible provision for "Business Income and Extra Expenses" under the Policy.  Thus, Custom is not relieved from owing a deductible simply because it has made a claim only for one and not the other.

Our finding that Custom owes some non-zero deductible for its extra expense claim is likewise compatible with the purposes underlying deductibles.  "Through deductibles or self-insured retentions, a policy holder may elect to absorb part of the risk for any covered loss in exchange for reduced premiums." *Nicor*, 223 Ill. 2d at 436, 860 N.E.2d at 296; *see also Basler Turbo Conversions LLC v. HCC Ins. Co.*, 601 F. Supp. 2d 1082, 1091 (E.D. Wis. 2009) ("One function of a deductible is to require the insured to share in the risk of loss, and thereby provide an incentive to fulfill his duty to protect and adequately maintain the insured property.")  Custom bargained for Amerisure to reimburse lost income or extra expenses from a malfunctioning extruder only after Custom absorbed three days' worth of the cost of the breakdown.  Custom is bound by its contract to maintain that bargain. *See Progressive Universal Ins. Co. of Ill. v. Liberty Mut. Fire Ins. Co.*, 215 Ill. 2d 121, 135, 828 N.E.2d 1175, 1183 (Ill. 2005), *as*

*modified on denial of reh'g* (June 9, 2005) (if insured can escape provisions of insurance contract, "[t]he insurance company would be denied the benefit of its bargain, and the insured would receive a windfall . . . ."). We thus deny this portion of Custom's motion for summary judgment.

### C. "All Locations, Affected by the 'Equipment Breakdown'"

Another aspect of the ADV numerator requires interpretation. The ADV definition states that the ADV numerator applies to "all locations, affected by the 'Equipment Breakdown.'" (Custom SOF ¶ 17.) The ADV definition further specifies, "the ADV applies to all locations included in the valuation of the loss." (*Id.*) The parties dispute what "locations" this covers. Custom maintains that the only location affected by Press 4's breakdown was the building in which Press 4 was located: 620 Division Street, South Elgin, Illinois. (Mem. at 13–14.) Amerisure, however, construes "all locations" to cover Custom's entire business, and it applied this understanding to its original deductible calculation by using $21,590,000.00 as the ADV numerator, a figure representing Custom's total projected business earnings for all operations in 2015. (Resp. at 6.) Amerisure rests its expansive interpretation of "all locations" on (1) a statement from Custom's Controller that all of Custom's income would have been affected had Custom not been able to shift production after the extruder breakdown, and (2) the fact that Custom does not account for its income on a building-by-building basis. (*Id.*) The practical import of this dispute, of course, is in the size of the deductible: if the ADV numerator includes income for all of Custom's properties, the resulting deductible would be considerably larger than if the numerator counted only the income attributable to a single building.

We need only look to the language of the Policy, rather than to extrinsic evidence of Custom's accounting practices or its Controller's statements, to determine the meaning of "all locations." *See Valley Forge*, 223 Ill. 2d at 363, 860 N.E.2d at 314 (construing an insurance

policy either as written if unambiguous or else strictly construing against insurer if ambiguous). The words "all locations" do not stand alone in the ADV definition; they are modified in one place by the phrase "affected by the 'Equipment Breakdown,'" and in another place by the phrase "included in the valuation of the loss." (Custom SOF ¶ 17.) We think the more natural reading of these provisions would apply only to the building that suffered the damage, rather than to all of the insured's covered properties, damaged or not. *See Weiss*, 59 Ill. 2d at 171, 319 N.E.2d at 495 (declining to extend term "site of operations" in an insurance policy to include not just the insured's property, but also "the entire route to a distant destination and the destination itself").

But our analysis is not limited to these provisions alone. "An insurance contract must . . . be interpreted from an examination of the complete document and not an isolated part." *Zurich Ins. Co. v. Raymark Indus., Inc.*, 118 Ill. 2d 23, 50, 514 N.E.2d 150, 162 (Ill. 1987). Other portions of the Policy, which describe individual Custom buildings as separately insured entities, confirm our reading. The Policy includes a detailed "Scheduled Locations Endorsement" that specifies, "coverage provided by the Commercial Output Program coverages [*i.e.*, the Policy] applies only to the 'covered locations' described on the Location Schedule." (Policy at PageID #:54.) The Policy's "Definitions" entry for "[c]overed locations" stipulates that where the Policy includes a Scheduled Locations Endorsement, "'covered location' means a location that is described on the Location Schedule." (*Id.* at PageID #:65.) The "Location Schedule" in turn enumerates each building in Custom's holdings as a different "Covered Location," (*id.* at PageID #:24–35), including the building at issue in this litigation, 620 Division Street, South Elgin, Illinois, (*id.* at PageID #:31). Indeed, the Policy identifies 620 Division Street as a standalone "Covered Location" in two separate provisions, listing a building and business income coverage limit for that specific property. (*Id.* at PageID #:31, 117.) The granular fashion

15

in which the Policy treats each of Custom's properties leads us to conclude that the ADV

definition's reference to "all locations, affected by the 'Equipment Breakdown,'"

(Custom SOF ¶ 17), refers only to the specific building in which the machinery malfunction took

place. *See Outboard Marine*, 154 Ill. 2d at 108, 607 N.E.2d at 1212 (admonishing courts to

construe insurance contracts as a whole).

According to the undisputed facts, only Press 4 at 620 Division Street suffered a

breakdown; all other Custom properties continued to operate normally. (Custom SOF ¶¶ 38, 39.)

Therefore, only the income of the Press 4 extruder at 620 Division Street should be used in

calculating ADV under this claim. This portion of Custom's summary judgment motion is

granted, and the corresponding portion of Amerisure's cross-motion is likewise denied.

### D. "Divided by the Number of Working Days, in that Period"

The foregoing has exclusively concerned how to calculate the ADV numerator.

However, the parties also dispute the meaning of the ADV denominator. The ADV definition

states that the numerator will be "divided by the number of working days, in that period" of the

equipment breakdown. (Custom SOF ¶ 17.) In its initial deductible calculation, Amerisure used

251 days as the denominator, reasoning that the period of working days in 2016 would equal the

number of weekdays minus federal holidays. (Custom SOF ¶ 34.) Custom contends that the

denominator should be 300 days to reflect its actual operating days in 2016. (Mem. at 13.)

Amerisure objects to Custom's proposed number, insisting that 300 days is the number that *all* of

Custom's extruders operated in 2016, whereas Press 4 operated for only 262 days in 2016.

(Resp. at 9–10; Amerisure SOF ¶ 75.) All of these arguments assume that the ADV numerator

would be some value representing annual income, thus producing an average of annual income

over "working days" in a year.

First, there is a question as to whether "working days" refers only to the operations of the extruder at issue—Press 4—or whether it refers to operating days for the entire business. Amerisure argues that if the ADV numerator is limited only to the single extruder that malfunctioned, the ADV denominator should likewise refer only to the working days for that extruder. (Resp. at 9.) Custom maintains that the Policy does not require this result, and that its figure for Custom's 2016 operations for all extruders is more appropriate. (Custom's Reply at 9.) Amerisure has the better of this argument. We have already determined that the ADV numerator is limited only to income attributable to Press 4, the "location[] affected by the 'Equipment Breakdown.'" (*See* Custom SOF ¶ 17.) We see no reason why the denominator would not also be limited to this same "location."

However, even if we limit the ADV denominator to Press 4 alone, the term "working days" as used in the Policy is reasonably susceptible to two interpretations. On one hand, "working days" could mean "days actually worked." *See Murray v. L.S.P. Wholesaler Florists Co.*, No. 96 C 424, 1996 WL 495556, at *2 (N.D. Ill. Aug. 28, 1996) (finding business that operates Monday through Saturday has six "working days" per week, "[t]he number of days a business conducts its normal operations"). On the other hand, because the ADV definition contemplates a scenario in which there has been an equipment breakdown, the formula asks the insurer to reckon the "working days" the business would have had with no breakdown. Amerisure's method of calculating weekdays minus holidays, even if the result does not reflect the days Custom actually operated, is not an unreasonable conjecture for "working days" in the abstract and given the necessity of imagining what days a fully functioning Press 4 would have worked. *Cf.* 29 C.F.R. § 1903.22 (federal regulation defining "Working days" as "Mondays through Fridays, but shall not include Saturdays, Sundays, or Federal holidays").

Construing an ambiguous insurance policy provision strictly against the insurer, as we must, *Nicor*, 223 Ill. 2d at 417, 860 N.E.2d at 286, the best interpretation for "working days" here is "the number of days the affected location conducts its normal operations." *See Murray*, 1996 WL 495556, at *2. Custom clearly operates more than the days Amerisure assumed to be its "working days." Custom as a whole operated for 300 days in 2016. (Custom SOF ¶ 42.) Based on undisputed documents in the record, we calculate that Press 4 operated for 301 days in 2015, when it was operating normally. (Dkt. No. 16–3 at 20–31 (tallying Press 4's actual daily operations for each month in 2015).) However, when it experienced a breakdown, Press 4 operated for 262 days in 2016, less than it likely would have operated had no breakdown occurred. (Amerisure SOF ¶ 75.) As we found in interpreting the ADV numerator, the ADV as defined in this contract aims to describe the value that would have been gained from a particular piece of machinery under normal conditions. In this case, using "the number of days Press 4 conducts its normal operations" as the ADV denominator thus comports with the purpose of the ADV definition and with Custom's actual business practice. This reading of "working days" also sits more naturally with the ADV example, which uses 10 days as the ADV denominator for a business interrupted partially or completely for 10 days. (Custom SOF ¶ 17.)

In sum, we construe "working days" in the ADV denominator as the number of days that Press 4 would have worked if it had been operating normally. This portion of Custom's motion for summary judgment is granted, and the corresponding portion of Amerisure's cross-motion is denied.

\*          \*          \*

To recap our construction of the extra expense deductible in the Policy, the ADV formula requires a figure representing the total income generated by 620 Division Street (housing Press 4) had Press 4 continued operating normally during the period of the breakdown, divided by the

actual number of days Press 4 would have operated in that period.  The resulting ADV figure

must then be multiplied by three to determine the extruder extra expense deductible.  (*See*

Custom SOF ¶¶ 16, 17.)  However, we cannot assign a specific number to either the ADV

numerator or the denominator on the record before us because the facts are disputed.

## II.     CALCULATING THE DEDUCTIBLE

The parties have proposed various figures for the ADV formula numerator.  Amerisure

used $21,590,00.00 in its initial deductible calculation, a figure derived from a total projected

"Business Income Value" ("BIV") for 2015 that Custom listed on its 2015 insurance renewal

paperwork.  (*Id.* ¶¶ 32, 33, 36.)  Amerisure never informed Custom that this BIV would be used

to calculate Custom's deductible.  (*Id.* ¶ 43; Mem. at 11.)  As already discussed, Amerisure used

a figure that accounted for income from all of Custom's holdings, rather than limiting the figure

to 620 Division Street's income as the ADV numerator requires.

Custom simultaneously assails Amerisure's use of the BIV and uses that same number to

propose an alternative deductible calculation.  Custom first attacks Amerisure's assertion that the

BIV forms the ADV numerator, arguing that Amerisure never advised Custom the BIV would be

used in deductible determinations and that Amerisure "simply plucked [the BIV] from the 2015

Worksheet and inserted [it] into the formula without any rhyme, reason, or connection to the

loss." (Mem. at 10, 11.)  However, in arguing that the ADV numerator should be limited to

Press 4's income alone, Custom reaches an alternative ADV numerator of $7,124,700.00 by

multiplying the 2015 BIV by 33 percent (on the logic that Press 4 produced 33 percent of

Custom's total aluminum output in 2015).  (Custom SOF ¶ 40; Mem. at 13–14.)  Amerisure

vigorously objects to Custom's alternative number because Custom does not account for

earnings on a building-by-building basis.  (Amerisure SOF ¶ 40 (responding to

Custom SOF ¶ 40); Resp. at 9.)  Neither party disputes that the BIV figure is merely an estimate of Custom's 2015 net value.  (*See* Custom SOF ¶ 33.)

Determining a final number for the ADV numerator (and denominator, for that matter) will amount to the calculation of damages in this case, because Amerisure would be liable to reimburse Custom for any amount of its $211,534.00 extra expense claim in excess of the ultimate deductible.  (*Id.* ¶¶ 13, 25, 26.)  Although the measure of damages will not be lost profits *per se*, the ADV formula essentially asks the parties to determine the lost income from a piece of broken machinery.  Thus, the rules to determine lost profits damages apply to this case. In finding lost profits, "mathematical precision" is not required, but damages must be proven "to a reasonable degree of certainty."  *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 632–33 (7th Cir. 2007) (plaintiff claiming lost profits in Illinois must "establish a reasonable basis for computation of . . . damages" with definite or tangible proof "to a reasonable degree of certainty" (quotations omitted)); *Cont'l Sand & Gravel, Inc. v. K & K Sand & Gravel, Inc.*, 755 F.2d 87, 92 (7th Cir. 1985) (lost profits damages "must be proven with reasonable certainty," and "exact precision is not required" so long as the evidence "provides a reasonable basis for assessing damages"); Restatement (Second) of Contracts § 352 cmt. *a* (1981) ("Damages need not be calculable with mathematical accuracy and are often at best approximate.")  In addition, the "long-standing rule in Illinois is that lost profits may be a measure of damages where a business is interrupted, but the business must have been established prior to the interruption so that the evidence of lost profits is not speculative."  *Drs. Sellke & Conlon, Ltd. v. Twin Oaks Realty, Inc.*, 143 Ill. App. 3d 168, 174, 491 N.E.2d 912, 917 (2d Dist. 1986).  The party claiming damages bears the burden of establishing the amount with reasonable certainty.  *TAS Distrib. Co.*, 491 F.3d at 632.

The ADV numerator, as interpreted, requires an estimate of the income that would have been produced had Press 4 continued operating normally during the breakdown period. However, the numbers the parties propose in their summary judgment motions are insufficient to determine "to a reasonable degree of certainty" what that income would have been. *See id.* Both parties base their numerator calculations on the 2015 BIV, an estimate of the net business value Custom anticipated (as of fall 2015) it would obtain by the end of that year. But this figure does not provide enough evidence from which to form a "reasonable basis" for the income Custom would have made at 620 Division Street in 2016, the year of the breakdown, had Press 4 kept running. *Id.* And Custom's calculation that Press 4 produced one-third of Custom's aluminum output in 2015 is inapposite because, as revealed in discovery, Custom had four extruders operating in 2015, but added a fifth in 2016, (Schuman Dep. at 20), making it unlikely that Press 4's *2016* output (assuming normal operation) would amount to one-third of Custom's total.

The ADV provision as written calls for an estimate supposing hypothetical conditions. We do not believe that the undisputed numbers before us capture with "reasonable certainty" an estimate of 620 Division Street's income during the time that Press 4 was broken down.[8] *TAS Distrib. Co.*, 491 F.3d at 632; *Cont'l Sand & Gravel*, 755 F.2d at 92. We thus cannot arrive at a figure for the ADV numerator on the parties' present motions.

---

[8] Although Amerisure contends that finding an income measure for 620 Division Street is improper because "Custom does not account for, track, or allocate its income based on extruder or building," (Resp. at 9), what matters is not how Custom accounts for income but what the Policy commands. It will be left to a jury to decide, based on the parties' evidence and, if necessary, expert testimony, what that income estimate for 620 Division Street during the breakdown period was most likely to be. *See, e.g.*, *Schatz v. Abbott Labs., Inc.*, 51 Ill. 2d 143, 148, 281 N.E.2d 323, 326 (Ill. 1972) (setting damages for interrupted theater business based on reasonable evidence of past profits and operating costs); *Rhodes v. Sigler*, 44 Ill. App. 3d 375, 380, 357 N.E.2d 846, 850 (3d Dist. 1976) (affirming award of business interruption damages to farmer after evidence sufficiently established basis).

As for the ADV denominator, we have already rejected Amerisure's argument that the "number of working days, in that period" be limited to weekdays in 2016 minus holidays. However, Custom's proposed alternative counts the days that *all* of Custom's operations ran in 2016.  (Custom SOF ¶ 42.)  Although we have figures from one year, 2015, for how many days *Press 4* would run if operating normally (301 days), this single data point does not provide a reasonable estimate for Press 4's projected working days in 2016.  More information is required to determine how many days Press 4 typically runs over a period of years or some evidence that the 2015 figures in the record are typical of Press 4's productivity overall.  *See Schatz*, 51 Ill. 2d at 148, 281 N.E.2d at 326 (finding reasonable a measure of damages that included gross receipts for period of nine years).  We do not have this evidence before us.  We thus cannot determine the ADV denominator on the undisputed record.[9]

We will not decide disputed facts at this stage.  *See Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510 ("[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").  We therefore deny both parties' summary judgment motions insofar as they ask this Court to determine the precise numbers that should be used for the ADV numerator and denominator, and thus the extruder extra expense deductible.[10]

---

[9] Both parties' arguments assume to some degree that ADV would best be determined by dividing annual income by the number of working days in that year.  (Mem. at 13; Resp. at 3.)  While the ultimate figure might come to the same average, we point out that the ADV calculation calls for both numerator and denominator to be limited to the period of the equipment breakdown, rather than to the entire year.  (*See* Custom SOF ¶ 17 (ADV definition calling for income that would have been earned "during the interruption of business" and for the number of working days "in that period").)

[10] Because we do not reach the amount of damages, we also do not reach Custom's argument for an award of pre- and post-judgment interest and costs.  (Mem. at 14; Custom's Reply at 10 n.4.)

**CONCLUSION**

For the foregoing reasons, we find as a matter of law that the Policy's Average Daily Value in this case requires the total income that would have been generated by 620 Division Street during the period of Press 4's breakdown had it continued operating normally, divided by the actual number of days Press 4 would have operated in that period.  The resulting ADV must then be multiplied by three to determine the extruder extra expense deductible.  Summary judgment is thus granted as to the portion of Custom's motion that advocated this interpretation.  Custom's summary judgment motion is denied in part because there is a genuine dispute of material fact as to the numbers to be used in the deductible calculation on the current record.  Specific numbers for the ADV numerator and denominator need to be decided at trial.[11]  Because we find that Amerisure's deductible calculation improperly interprets the Policy, we deny Amerisure's cross-motion for summary judgment.  It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated: November 14, 2018
       Chicago, Illinois

---

[11] As significant legal questions are now decided, and the issues narrowed, this might be an opportune time for the parties to renew settlement discussions.